# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

<hr>

## NO. 03-11-00242-CV

<hr>

**Constance Maxwell, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

<hr>

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
### NO. 241,149-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

<hr>

## M E M O R A N D U M   O P I N I O N

Appellant Constance Maxwell appeals a final order terminating her parental relationship with her daughter, A.M.M. In two issues on appeal, Maxwell alleges that appointed trial counsel provided ineffective assistance and that the evidence is factually insufficient to support jury findings that grounds exist to terminate the parent-child relationship and that termination of parental rights is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(E), (1)(N), (2) (West Supp. 2011).[1] We will affirm the trial court's judgment.

<hr>

[1] The statute governing involuntary termination of parental rights was amended effective September 1, 2011, but the amendments are not material to the issues in this case. We therefore cite to the current statute for convenience.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are taken from the evidence presented at trial. In 2007 Maxwell was diagnosed with paranoid schizophrenia. She has regularly been prescribed various anti-psychotics to help control her symptoms, which include hallucinations and manic episodes. She has also been diagnosed with depression and prescribed medications related to that condition. She has not regularly taken her medications. In 2008 Maxwell's daughter, K.G., was removed from her custody due to Maxwell's alleged physical abuse and volatile behavior, which endangered the child's well-being. K.G. was ultimately placed with her biological father, and Maxwell retained her parental rights.

This case involves Maxwell's second child, A.M.M., who was born in late January 2010, approximately four weeks prematurely. Due to Maxwell's prior involvement with the Texas Department of Family and Protective Services ("the Department"), hospital personnel contacted the Department shortly after A.M.M. was born and expressed concerns about Maxwell's mental health status and the fact that she was not currently taking medications for her mental illnesses. Although nurses reported that Maxwell was doing fairly well caring for the child, they were concerned that she was allowing the infant to sleep unsecured on her chest, was over-feeding the child, and did not seem to appreciate the potential adverse consequences of these behaviors even after they were explained to her.

Following this report, a Department investigator, Sheri Polite, visited Maxwell at the hospital and found Maxwell asleep, with A.M.M. lying unsecured on Maxwell's chest. Although Polite discussed safe-sleeping recommendations with Maxwell, Maxwell stated that the baby was

2

fine sleeping with her, and Polite felt that Maxwell failed to comprehend the risks associated with that activity. During the course of the interview, Maxwell also admitted that she voluntarily ceased taking her anti-psychotic medications when she found out that she was pregnant because she did not want to harm her unborn child. She further stated that she did not intend to resume taking her prescribed medications until the summer. There is no indication in the record that she was advised to cease taking all medications during or after pregnancy, and Maxwell conceded that she never discussed alternative medications with her doctor. Due to concerns about the child's safety, A.M.M. was removed from Maxwell's care, initially placed with a foster family, and later placed in Maxwell's cousin's care.

Shortly after removal, the Department provided Maxwell with a "Family Service Plan" that specified a number of prerequisites to reunification. Among other things, the service plan required Maxwell to (1) participate in services provided by her mental health professionals and provide a medical release of information so that her progress could be monitored, (2) participate in supervised visitation with A.M.M., (3) participate in individual counseling, (4) obtain a psychological evaluation, (5) complete a parenting class, (6) refrain from participating in criminal acts, and (7) demonstrate an ability to provide her child basic necessities, including food, clothing, shelter, medical care, and supervision.

Maxwell did not fully comply with the requirements and prohibitions in the service plan. She was arrested in May 2010 for trespassing and was incarcerated until July 22. She tested positive for cocaine and marijuana use in September 2010. She did not begin individual counseling until September 2010, but she regularly participated thereafter. She did not resume taking her

3

prescribed medications until October or November 2010, despite the fact that she was hospitalized in July 2010 with a mental-health crisis. She further failed to maintain stable housing, moving a number of times in a nine-month period. She also failed to complete the requisite parenting class, although she did provide a certificate from a parenting course she completed before A.M.M. was born.

In addition to the foregoing deficiencies, Maxwell's visitation with A.M.M. was inconsistent. Initially, Maxwell had supervised visits at her cousin's house, but those visits were moved to the Belton Police Department after a dispute arose between Maxwell and her cousin. Before a new location could be established, Maxwell's visitation was temporarily suspended. Once the location changed and supervised visits were reinstated, Maxwell had difficulty attending the supervised visits due to lack of transportation and other issues. Maxwell requested that the location be changed to the Temple Police Department, but that location was unacceptable to the Department because they could not guarantee a private room for visitation. No visitation occurred between early May and late July 2010 due to Maxwell's incarceration and hospitalization. Shortly thereafter, Maxwell was advised that visitation with A.M.M. would be discontinued because she had missed too many appointments. At about the same time, A.M.M. was removed from Maxwell's cousin's custody and placed with a foster family because the Department believed the baby was spending excessive amounts of time in day care. In addition, the Department discovered that the cousin may have allowed Maxwell to visit the child during the time her supervision was temporarily suspended.

The only term of the service plan that Maxwell successfully completed was the requirement that she obtain a psychological evaluation, which she accomplished in early February

4

2010. In a written evaluation, Dr. Timothy J. Daheim recounted Maxwell's confessions of previous drug use, aggressive behavior, and criminal activity. Daheim further noted that Maxwell downplayed the significance of her past aggressive behavior, her mental health issues, and the need to take medication to control deleterious symptoms of her mental-health conditions. Daheim concluded that Maxwell "possesses emotional impairments that negatively affect her ability to provide proper care for her child." He nevertheless determined that reunification was possible if Maxwell (1) stabilized on medication, (2) worked with a counselor to develop a safety plan to address paranoid and delusional thought processes that negatively affect her ability to care for her child, (3) worked with a drug counselor and maintained sobriety, and (4) regularly participated in psychiatric treatment and received ongoing medication management. If Maxwell failed to achieve these objectives, however, Daheim believed that an alternative permanent placement for the child should be pursued.

Asserting that Maxwell had not significantly complied with the family service plan and had not achieved the objectives noted in Daheim's report, the Department moved forward with termination proceedings against Maxwell and individuals who had potentially fathered A.M.M.[2] At the time of trial, Maxwell had a new apartment in Austin, had just received a general business degree from Temple College, and had been on her medication for a few months. Maxwell's mother testified that she was willing to adopt A.M.M. and her cousin testified that she was willing to help Maxwell

---

[2] Maxwell provided the Department with the names of several men who might have fathered A.M.M. One of the potential fathers was served and individually represented by counsel at trial, but did not personally appear; another individual executed an affidavit relinquishing parental rights before trial; and the remaining men were identified to the jury as "unknown fathers" and were represented by appointed counsel.

care for the child.  However, both Daheim and Terri Schroeder (Maxwell's counselor) testified that Maxwell was not presently able to care for A.M.M. and had not shown sufficient progress in demonstrating stability on her medications, which was essential to her ability to safely care for her child.  In addition, the evidence showed that Maxwell had a troubled relationship with her mother, who testified to Maxwell's past aggressive and volatile behavior.  Her mother also testified that she reported to the Department that Maxwell abused her older child, which led to the child's being removed from Maxwell's care.  The jury also heard evidence that after Maxwell and her cousin got into a dispute in March 2010, the cousin refused to supervise Maxwell's visits with A.M.M. and asked the Department to assume custody of the child.

The jury found that clear and convincing evidence established two independent statutory grounds for terminating the parent-child relationship—child endangerment and constructive abandonment—and that termination was in A.M.M.'s best interest. *See id*.  Thereafter, the trial court rendered judgment terminating the parent-child relationship as to all parties.  Maxwell appeals the trial court's judgment.  The potential fathers did not perfect an appeal.

## DISCUSSION

On appeal, Maxwell asserts that she was deprived of the effective assistance of counsel and that the evidence is factually insufficient to support termination of her parental rights.  We will address each point in turn.

6

*Ineffective Assistance of Counsel*

Maxwell first argues that she was deprived of effective assistance of counsel. Maxwell asserts that her trial counsel's representation was presumptively ineffective because counsel was basically "inert." *See United States v. Cronic*, 466 U.S. 648, 658-59 (1984). Alternatively, Maxwell contends that she was prejudiced by counsel's deficient performance. *See In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). Maxwell alleges that counsel's performance was inert and grossly deficient because he: (1) failed to make proper objections to hearsay, improper bolstering of witnesses, and improper comments by opposing counsel in voir dire, (2) failed to subpoena known rebuttal witnesses, (3) subpoened Maxwell's mother to testify and allowed her to be called by opposing counsel, (4) failed to file alternative pleadings for relative placement, (5) failed to cross-examine Maxwell, (6) failed to effectively cross-examine adverse witnesses, (7) failed to challenge Schroeder's qualifications as an expert witness in clinical psychology, and (8) only objected six times during trial.

In Texas, indigent parents in termination proceedings have a statutory right to counsel. Tex. Fam. Code Ann. § 107.013(a)(1) (West Supp. 2011); *In re M.S.*, 115 S.W.3d at 544. Because it would be a useless gesture to recognize the importance of counsel in termination proceedings by statute but not to require that counsel perform effectively, this statutory right embodies the right to effective assistance of counsel. *In re M.S.*, 115 S.W.3d at 544. To determine whether parents in termination proceedings received effective assistance of counsel, Texas courts apply the two-pronged standard established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re M.S.*, 115 S.W.3d at 544-45. To satisfy the *Strickland*

7

standard, Maxwell must show both (1) that her attorney's performance was so deficient and contained such serious errors that the attorney was not functioning as counsel and (2) that the deficient performance prejudiced her defense to such a degree that she was deprived of a fair trial. *Strickland*, 466 U.S. at 687. Any allegation of ineffectiveness must be firmly founded in the record. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.).

Maxwell first asserts that she was constructively denied counsel because her counsel was inert. An appellant alleging ineffective assistance of counsel need not prove prejudice in cases in which counsel entirely fails to subject the opposition's case to meaningful adversarial testing. *Cronic*, 466 U.S. at 658-59 (1984); *Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir. 1997); *Middleton v. Texas Dep't of Protective & Reg. Servs.,* No. 03-03-00766-CV, 2005 WL 1115957, at *2 (Tex. App.—Austin May 12, 2005, pet. denied) (mem. op.) (analyzing ineffective-assistance claim under *Cronic* standard). Under the *Cronic* standard, prejudice is presumed if an appellant can establish that counsel was "not merely incompetent, but inert." *Childress*, 103 F.3d at 1228. However, "'bad lawyering, regardless of *how* bad, does not support the . . . presumption of prejudice' under *Cronic*." *Id.* at 1229 (quoting *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990)) (emphasis in original).

From our review of the record, we conclude that Maxwell's counsel subjected the Department's case to meaningful adversarial testing and was not inert under *Cronic*. He may not have objected in instances in which it might have been appropriate to do so, but he did object to the admission of some adverse evidence. In fact, counsel twice objected to evidence regarding

Maxwell's past criminal conduct on relevancy grounds. Maxwell contends that the relevancy objection was insufficient because it did not point out the remoteness of the convictions. Maxwell, however, had already stated the years in which the crimes were committed, making the remoteness of the convictions evident to the court, and counsel followed up his objection stating that "[a]ll of these are prior to this event and none of them have to do with children." Although Maxwell complains that trial counsel only objected six times, there is no minimum number of acceptable objections that counsel must make to adequately represent a client. Moreover, Maxwell's trial counsel objected at least as often, if not more often, than the other attorneys at trial, including those with similarly aligned interests.

Maxwell's trial counsel subpoenaed witnesses for trial and called one witness in addition to the witnesses called by the Department's attorney. He also vigorously cross-examined witnesses to emphasize the limitations of their knowledge or contact with Maxwell. Counsel further elicited other testimony beneficial to Maxwell's case, including testimony that (1) both Maxwell and A.M.M. tested negative for illegal substances following the baby's birth, (2) Maxwell had completed an anger management course, (3) the Department's workers were unaware that Maxwell had actually completed a parenting class, (4) no one had ascertained whether Maxwell's prescribed medications would have been dangerous to her child while *in utero*, (5) it is possible that the drugs might have been harmful to a developing fetus, and (6) it is understandable that a mother whose children had been removed from her custody would be emotional and unstable in encounters concerning removal of those children. He also questioned the Department's witnesses about not investigating Maxwell's residences prior to trial to determine their suitability.

9

In his closing statement, counsel emphasized the progress Maxwell had made participating in services, highlighted Maxwell's efforts to maintain a relationship with A.M.M., evaluated and reviewed adverse evidence and testimony, and reminded the jurors of testimony that Maxwell was not violent and had not committed any violent crimes. Counsel's performance was far from the "inert" behavior of the attorney in *Childress*, whose sole activity was to stand beside the defendant and execute a waiver of his right to a jury trial, and whom the Fifth Circuit's opinion twice compared to a "potted plant." *See Childress*, 103 F.3d at 1223, 1226, 1231. Because Maxwell has not shown she was constructively denied counsel under the *Cronic* standard, we may not presume prejudice if we determine that counsel's conduct is otherwise deficient.

In determining whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case and focus on whether counsel performed in a reasonably effective manner. *In re M.S.*, 115 S.W.3d at 545. The Texas Supreme Court has stated that "[c]ounsel's performance falls below acceptable levels of performance when the 'representation is so grossly deficient as to render proceedings fundamentally unfair.'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). In considering the acceptability of counsel's performance, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and it is only when counsel's conduct is "'so outrageous that no competent attorney would have engaged in it,' that the challenged conduct will constitute ineffective assistance." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001), and *Strickland*, 466 U.S. at 689).

10

An assertion of ineffective assistance will be sustained only if the record affirmatively supports such a claim. *See Thompson*, 9 S.W.3d at 814; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). However, "rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation: '[i]n the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel.'" *Bone v. State*, 77 S.W.3d 828, 833 & n.13 (Tex. Crim. App. 2002) (quoting *Thompson*, 9 S.W.3d at 813-14) (alteration in original). When the record is silent as to counsel's subjective motivations, courts will ordinarily presume that the challenged action might be considered sound trial strategy. *See Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). An error in trial strategy will be deemed inadequate representation only if counsel's actions are without any plausible basis. *Ex parte Ewing*, 570 S.W.2d 941, 943 (Tex. Crim. App. 1978); *Hollis v. State*, 219 S.W.3d 446, 470-71 (Tex. App.—Austin 2007, no pet.).

The appellate record in this case is devoid of evidence or explanation for trial counsel's reasons or strategies for the conduct about which Maxwell complains. Therefore, Maxwell carries a heavy burden of establishing that there are no possible strategic reasons for counsel's conduct. She has failed to carry that burden.

Many of counsel's alleged deficiencies concern classic matters of trial strategy, including what witnesses to call, whether to cross-examine a particular witness, how to cross-examine the witnesses, when to object, what evidence to offer at trial, and whether to file alternative pleadings. The fact that the case could have been tried differently does not establish that counsel's performance was deficient. In addition, the record reflects that counsel represented

11

Maxwell in a reasonably effective manner. Counsel adduced evidence of Maxwell's improvement in various areas and participation in services, explanations for Maxwell's behavior, family support, requests for visitation that the Department did not allow, and the lack of physical harm to A.M.M. There is also evidence of Maxwell's plans to care for A.M.M.; although counsel did not himself question Maxwell about her plans to care for A.M.M., "[f]ailure to conduct 'more effective' cross-examination to reinforce facts already before the court is not such a serious error that the attorney was not functioning as counsel." *Middleton*, 2005 WL 1115957 at *5.

Although Maxwell alleges that counsel was ineffective for not challenging Terri Schroeder's qualifications as a "clinical psychologist," there is nothing in the record to indicate that she was not qualified to give the opinions she gave at trial or that she is not, in fact, qualified as a "clinical psychologist." Schroeder testified that she is "self-employed as a psychotherapist," has practiced psychology work with the public for sixteen years, and holds a master of science in social work.

Among other things, Maxwell complains that trial counsel failed to file alternative pleadings for A.M.M.'s placement with relatives, in particular Maxwell's mother and cousin. The cousin testified that she was willing to help Maxwell take care of A.M.M. but did not indicate a willingness to take custody of her. Moreover, Maxwell's mother stated that she would be willing to take custody of A.M.M., but she had previously declined to take custody following removal, stating that she wanted A.M.M. to be placed with "somebody young, vibrant, instead of stuck in a bedroom with me watching T.V." Although Maxwell testified that her mother and cousin would help her raise A.M.M., there was also testimony that Maxwell had strained relationships with both

12

of these relatives. When Maxwell was questioned about her expectation of family support given the discord in her family, she testified: "Well, for my children I'll go to the devil if I have to." We cannot say that there is no plausible strategic reason for not filing the alternative pleadings Maxwell suggests counsel should have filed. Based on the testimony at trial, it is possible that filing such pleadings may have been against Maxwell's wishes or counsel might have deemed such pleadings to be futile.

Maxwell complains that trial counsel failed to provide documentation of her completed parenting class and anger management classes; however, the existence of the certificates was established through testimony at trial. She further alleges that counsel's representation was defective because he subpoenaed her mother to testify, and her mother gave damaging testimony about Maxwell's harsh discipline of her older child, K.G. The record shows that the mother's testimony was mixed, with some testimony that was helpful to Maxwell's case and some that was not. Without a record establishing counsel's reasons for making particular decisions, we cannot say that trial counsel's decisions were not based on sound trial strategy. Moreover, *Strickland* admonishes that an attorney's performance should not be viewed through the distorting lens of hindsight. 466 U.S. at 689.

"Whether the *Strickland* test has been met is to be judged by the 'totality of the representation' rather than by isolated acts or omissions of trial counsel, and the test is applied at the time of the trial, not through hindsight." *Delamora v. State*, 128 S.W.3d 344, 360 (Tex. App.—Austin 2004, pet. ref'd). On the record before the court, we cannot say that Maxwell has carried her burden of showing that counsel's representation as a whole was "'so outrageous that

13

no competent attorney would have engaged in it.'" *In re M.S.*, 115 S.W.3d at 545. We therefore overrule Maxwell's first point of error. In light of our disposition of Maxwell's ineffective-assistance claim, we need not consider the Department's argument that Maxwell's amended statement of points was insufficient to preserve the argument for appeal.

### *Factual Sufficiency of the Evidence*

To terminate the parent-child relationship, there must be clear and convincing evidence that the parent committed one or more of the acts specifically set forth in family code section 161.001(1) and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001. "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). In the present case, the jury found clear and convincing evidence of two independent grounds for terminating Maxwell's parental rights—child endangerment and constructive abandonment. *See id.* §§ 161.001(1)(E) (endangerment), .001(1)(N) (constructive abandonment). The jury also found that termination of Maxwell's parental rights was in the child's best interest. *See id.* §161.001(2). Although Maxwell concedes that the jury's findings are supported by legally sufficient evidence, she contends that they are not supported by factually sufficient evidence.

In reviewing the factual sufficiency of the evidence to support the jury's verdict, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The inquiry is "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth

14

of the state's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). In determining whether the evidence admitted at trial satisfies this exacting burden of proof, we must consider the disputed evidence and determine whether a reasonable factfinder could not have reasonably resolved that evidence in favor of the finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction [as to the statutory predicates], then the evidence is factually insufficient." *Id.* For the reasons that follow, we conclude that the judgment terminating Maxwell's parental rights must be affirmed based on the child-endangerment ground, obviating the need to analyze the factual sufficiency of the evidence to support the jury's constructive-abandonment finding. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

The jury determined that clear and convincing evidence established that Maxwell "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E). As used in the termination-of-parental-rights statute, endangerment means exposing a child to loss or injury, or jeopardizing a child's emotional or physical well-being. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The statute does not require that the endangering conduct be directed at the child or cause physical harm; rather, it is sufficient if the conduct endangers the child's emotional well-being. *Id.* However, the alleged endangerment must result directly from the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet.

15

denied); *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied) ("A voluntary, deliberate, and conscious 'course of conduct' by the parent, that endangers the child's physical and emotional well-being, is required."). In assessing an endangerment finding, we look to the parent's conduct both before and after the child's birth to determine whether termination is appropriate and consider both the parent's actions and failures to act. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re A.S.*, 261 S.W.3d at 83; *In re J.W.*, 152 S.W.3d at 205.

Additionally, although mental incompetence or mental illness alone is not grounds for terminating the parent-child relationship, "when a parent's mental state allows [her] to engage in conduct [that] endangers the physical or emotional well-being of the child, that conduct has a bearing on the advisability of terminating the parent's rights." *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence); *see also In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (finding mother's suicidal thoughts and history of noncompliance with medication schedule relevant to endangerment analysis); *Carter v. Dallas Cty. Child Welfare Unit*, 532 S.W.2d 140, 142 (Tex. Civ. App.—Dallas 1975, no writ). Likewise, the absence of self-control and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d at 845. And, as a general principle, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

In determining the child's best interest, the factfinder may consider a number of factors including: the desires of the child, the present and future physical and emotional needs of

16

the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the child's best interest, plans for the child by those individuals, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department need not prove all nine *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27.

While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the child's best interest. *See In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39. The focus of the inquiry is on the child's best interest, not the parent's best interest, and the need for permanence is of paramount importance in considering a child's present and future emotional and physical needs. *See Dupree v. Texas Dep't of Protective & Reg. Servs.*, 907 S.W.2d 81, 86-87 (Tex. App.—Dallas 1995, no writ). There is a strong presumption that the child's best interest will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Parental rights may not be terminated merely because a child might be better off living elsewhere. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). However, a factfinder may consider that the best interest of the child may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not

ordered. *See D.O. v. Texas Dep't. of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39.

Considering both the disputed and undisputed evidence, we conclude that the evidence is factually sufficient to support the jury's verdict that Maxwell violated subsection 161.001(E)(1) and that termination is in the child's best interest. At trial, the jury heard evidence regarding Maxwell's mental-health issues, which frequently went untreated. Maxwell has been diagnosed with paranoid schizophrenia and has suffered from manic episodes, delusions, and hallucinations. Maxwell testified that she had been hospitalized for this condition at least three times in the two-to-three-year period preceding the trial, including one extensive stay at the Austin State Hospital. There was also testimony that she was prescribed certain medications to help control the deleterious effects of her illness but had a history of noncompliance with her medication schedule, voluntarily ceased taking her medications during her pregnancy, and failed to resume taking the medications until shortly before trial even though she was briefly hospitalized at the State Hospital in July 2010 for mental-health issues.

There was substantial evidence that Maxwell was unwilling or unable to appreciate the consequences of failing to treat her mental illness. Daheim testified that Maxwell downplayed the significance of both her symptoms and her failure to take prescribed medications. He also testified that Maxwell failed to appreciate the risk of harm to her child if her condition went untreated. He stated that Maxwell's plan to resume taking medications only when she felt symptoms were recurring was extremely dangerous: "She had indicated that [she would] go back on [medications] when the symptoms recur—that's very, very dangerous because usually symptoms

18

come back with a fervor. . . . It's not something that comes back very subtlely [sic]." He opined that Maxwell's prior history of instability with medication management indicated a substantial risk of inconsistency in the future. Maxwell's therapist, Terri Schroeder, testified similarly, citing Maxwell's inability or unwillingness to resume taking her medications during the pendency of these proceedings even though she was aware that doing so was essential to reunification with her daughter. She further stated that Maxwell was mentally unstable throughout the course of treatment. Both Schroeder and Daheim testified that there is a substantial risk to A.M.M.'s safety if Maxwell does not take her prescribed medications consistently and that risk had been clearly and consistently communicated to Maxwell while the underlying proceedings were pending.

In addition to the evidence supporting a finding of child endangerment, there was other evidence supporting the jury's conclusion that termination of parental rights was in the child's best interest. The evidence at trial supported the view that Maxwell was unable to appreciate the need to consistently and regularly attend to her mental-health issues, continued to use illegal drugs during the pendency of the case, continued to exhibit unpredictable and unstable behavior, and failed to adequately participate in services offered by the Department. Several witnesses testified that Maxwell was not able to care for A.M.M. without assistance, and there was evidence that she did not have stable personal relationships and had an inadequate support system to help her care for the child. Although Maxwell's mother and cousin offered assistance, there was evidence that Maxwell's relationship with them was strained and unreliable. Witnesses further testified that Maxwell could not provide her child with a safe and stable home environment because she only began taking her psychiatric medications a few months before trial and had not demonstrated a desire or ability to

19

continue taking them. There was also evidence that Maxwell had been violent with her older child, K.G., was emotionally volatile, and used illegal drugs both before and after her pregnancy with A.M.M. Maxwell also moved around erratically and failed to demonstrate stability in housing and employment. In addition, there was testimony that A.M.M. was living in a foster home that is stable, cares for her, and meets her needs. The guardian ad litem appointed to represent A.M.M. further testified that the foster parents desire to adopt her.

Based on the foregoing, we conclude that the jury could reasonably have found that the facts presented provided clear and convincing evidence that Maxwell is unable to provide for A.M.M.'s physical and emotional needs and that her conduct has created a danger to the child's emotional well-being, both now and in the future. The same facts could provide clear and convincing evidence to the jury that Maxwell lacked the parenting abilities to retain her parental rights. We overrule Maxwell's second appellate issue.

## CONCLUSION

Maxwell has not shown that she received ineffective assistance of counsel or that the evidence was factually insufficient to support the findings that termination of her parental rights was warranted and was in her child's best interest. We overrule both points on appeal and affirm the trial court's judgment.

20

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   March 23, 2012